**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00154-CR**
**NO. 09-22-00155-CR**

_____

**JEFF TAYLOR BELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 20-06-06597-CR (Count I) and 20-06-06597-CR (Count II)**
_____

**MEMORANDUM OPINION**

Fabian Ramirez died after a motor vehicle collision on June 2, 2020. A grand jury indicted Appellant Jeff Taylor Bell ("Appellant," "Jeff," "Bell," or "the defendant") on two counts: (1) accident involving personal injury or death, for failing to stop and render aid at the scene of the accident, and (2) intoxication manslaughter, for driving while intoxicated and causing Ramirez's death. *See* Tex. Penal Code Ann. § 49.08(a); Tex. Transp. Code Ann. § 550.021(a). Bell pleaded not

1

guilty, but a jury found him guilty and, after a hearing on punishment, the jury assessed punishment at twenty years of confinement on each count. The trial court ordered the sentences to run concurrently. Bell appealed. In two issues, Bell argues that the trial court erred by denying the admission of evidence of the victim's blood alcohol content and in denying a jury instruction on the law of concurrent causation. We affirm as modified.

Pretrial Hearing

Prior to trial, the State filed a motion in limine seeking, in relevant part, to exclude from evidence "[a]ny statements during the guilt/innocence phase of trial concerning Fabian Ramirez consuming alcohol prior to the crash or any evidence concerning his blood alcohol concentration[]" because "[t]hese statements are not relevant to guilt or innocence." At a hearing on the motion, the prosecutor told the trial court that the defendant had bypassed a light and failed to yield right-of-way, which caused the crash involving Bell's vehicle and Ramirez's motorcycle, and there was no evidence that the driver of the motorcycle was at fault. The prosecutor also stated that although Ramirez's speed "could potentially be an issue[,]" any evidence of his possible intoxication was not relevant. Defense counsel responded that not allowing evidence of Ramirez's blood alcohol content would deny the defendant due process and the right to present a defense. The defense also argued that evidence of Ramirez's intoxication was relevant to causation. The trial court granted the motion

2

in limine and stated that evidence of Ramirez's blood alcohol content should not be mentioned without a discussion at the bench.

Evidence at Trial

Testimony of Alex Collier

Alex Collier testified that he was inside a gas station in Grangerland near the intersection of FM 2090 and FM 3083 on June 2, 2020, when he heard a loud noise. Collier ran outside, where he saw a motorcycle on the ground and a man lying to one side who did not look good, and he saw a woman lying on the ground about fifty yards away. Collier also observed scattered pieces of the motorcycle. Collier recalled that he saw a front bumper and a man standing by the vehicle with the missing bumper, and Collier said to him, "I think you killed him." Collier identified the defendant as the man he saw standing by his vehicle that day. Collier testified that about two minutes after the crash, the defendant then drove off, Collier yelled at him to stop, but the driver "just kept driving as fast as he could." Collier did not see the defendant call for assistance, provide his information or license, nor make any attempt to render aid. Collier stayed at the scene for several hours, and he did not see the defendant return.

Testimony of William Wayne

William Wayne testified that he was at the Exxon station in Grangerland on June 2, 2020, at about 7 p.m. when he heard "the sound of two vehicles smacking

3

into something." When Wayne ran outside, he saw that a motorcycle had run into a trailer and a man and a woman were lying on the ground. Wayne recalled that a gray car was involved in the crash, a white male had gotten out of the car and was looking at the scene, the man said either, "I'm so sorry or I messed up[,]" and then the man ran to his car and left the scene, but the bumper of the car was left behind. Wayne testified that he stayed at the gas station for a couple of hours, and he did not see the white male give his information to anyone, attempt to call for emergency assistance, render aid, nor return to the scene.

Testimony of Iftikhar Mehboob

Iftikhar Mehboob testified that he is the manager of the Exxon store in Grangerland on FM 3083. He testified he had known Roy Bell for some time, Jeff Bell had just moved back to the area shortly before the crash, and Jeff became a "regular customer" at his store and came to the store three to four times a day. Mehboob identified the defendant as Jeff Bell. Mehboob recalled that sometime in the early afternoon of June 2, 2020, Jeff Bell had come to his store, and Mehboob believed that Jeff was intoxicated based on his body language and he asked Jeff to go home and sleep. He also told Jeff not to drive. Mehboob testified that Jeff had bought beer at the store before. Mehboob also testified that he did not see Jeff drink that day.

4

Testimony of Roy Bell

Roy Bell ("Roy"), the defendant's father, testified that he lived very near the location where the accident happened, and that his son Jeff goes to the Exxon station to buy sodas and beer. According to Roy, Jeff arrived at his house early on June 2, 2020 driving a small passenger car he had just bought. Roy testified that Jeff had two 24-ounce beers on the table, and Roy saw Jeff drink one of the beers. Roy recalled that about 7 p.m., Jeff left to get a haircut, and Roy went to the store, where he heard ambulances, he saw a motorcycle lying on the ground and a bumper that looked like Jeff's bumper. According to Roy, when he was at the scene of the accident, he told law enforcement that Jeff had been drinking. Roy testified that he said Jeff had three or four beers because he considers one 24-ounce beer to be two beers, and he had seen two 24-ounce beers at the house that day. Roy agreed that, at the time of the accident, Roy stated that Jeff "didn't act drunk, but I assumed that he was drunk because he took off, and [] I just couldn't understand all that." According to Roy, Jeff has mental health issues, and he observed Jeff to be having "bipolar/schizophrenic episodes" the day of the accident.

Testimony of Maria Montano

Maria Montano testified that she owns a hair salon at the intersection of FM 2090 and FM 3083, where she was working on June 2, 2020. According to Montano, a man came into the salon after her closing time of 5 p.m. that day and asked for a

haircut, and she asked him to come back the next day. Montano testified that she had not seen the man before, he was "a little bit nervous and kind of stumbling[,]" and she thought maybe he was drunk or under the influence of something. Montano identified the defendant as the man who came into her salon that day after closing time.

Testimony of Kevin Culver

Kevin Culver, a Captain Paramedic with Montgomery County Hospital District, testified that he responded to a serious motor vehicle crash on June 2, 2020, just south of the intersection of FM 2090 and FM 3083 in front of an Exxon gas station. Culver recalled that the paramedic team arrived at the scene at 7:56 p.m., and they identified two patients—a man and a woman, and the woman was lying about thirty feet from the man. Culver testified that he treated the man, who was unconscious, had signs of internal hemorrhage, abrasions, a severe wound to his back, and signs of brain trauma. According to Culver, the woman's injuries were not as severe as the man's. Culver testified that the paramedics were very worried about whether the man might die and they did not try to assess the man for alcohol or drugs.

The patient care records for the man and the woman were admitted into evidence. The man's patient care report states that bystanders reported that the motorcycle was struck by a car, the motorcycle lost control and went off the road,

where it struck the back of a utility trailer, and both riders on the motorcycle were thrown from the bike. The woman's patient care report states that the woman told a paramedic, "we nearly got hit with a car. And my husband swerved into the parking lot to avoid a crash."

Testimony of Trooper Andrew Evans

Andrew Evans, a trooper with the Department of Public Safety ("DPS"), testified that he was called to investigate a crash scene in Grangerland on June 2, 2020. Evans identified several photo exhibits that showed the roadway and accident scene, and he testified that the photos show marks for gouges, skid marks, and body slide marks that are later used to scale and measure the scene. On cross-examination, Evans did not agree that the evidence showing the long distance the woman on the motorcycle traveled in the accident suggested that the motorcycle was traveling at a high rate of speed.

Testimony of Trooper Benjamin Polansky

Benjamin Polansky testified that he was a trooper with DPS and had attended six levels of crash school and a motorcycle-pedestrian reconstruction class. Polansky became involved in this case two days after the accident and assisted in measurements used for a scaled diagram. Polansky testified, that based on measurements at the scene, the post-impact speed of the motorcycle was between 56

and 64 miles an hour, and the speed limit on FM 3083 is 50 miles an hour, but that post-impact speeds do not indicate how fast the motorcycle was going before impact.

Polansky testified that a person on the roadway would have the right-of-way over a person coming out of the private drive at the convenience store, and the person leaving the private drive would be responsible to determine if there is enough space to exit onto the road. According to Polansky, if a person pulling out of a private drive caused an accident because someone on the road could not stop in time, the person leaving the drive would get a ticket. Polansky testified that the line of sight on the roadway is "pretty far[]" with nothing blocking a driver's view for about a mile and the improved shoulder where FM 3083 meets the convenience store private drive is "relatively large." Polansky agreed that a driver exiting the convenience store private drive could pull "pretty far forward" into the road without crossing the fog line.[1]

On cross-examination, Polansky agreed he did not know how fast the motorcycle was going at the time of the accident. He testified that the woman had travelled a little over 142 feet past where the motorcycle was after the accident. He also testified that the defendant caused the crash by failing to yield the right-of-way on a private drive.

---

[1] Trooper Polansky explained that the "fog line" is the white line at the far right of the road that separates the road from the shoulder.

## Testimony of Sergeant Jason Smith

Jason Smith, a sergeant with the Montgomery County Precinct 2 Constable's Office, testified that he is a mental health peace officer and has received training in detecting whether persons are under the influence of alcohol or controlled substances. He agreed he responded to an accident at the intersection of FM 2090 and FM 3083 on June 2, 2020, where the shoulder of the road was "wide enough for a vehicle to be able to pull off onto the shoulder and be completely out of the moving lane of traffic." Based on paint on the tire of a trailer that was parked at the gas station, Smith determined that "the motorcycle had made impact with the trailer." Smith testified that he ran the license plate of a detached car bumper found at the scene and learned it belonged to a 1999 Honda Accord. Smith also found a helmet and protective motorcycle vest for the male victim and a jacket and helmet for the female victim. According to Smith, it was not dark at the time of the collision. Based on the evidence he collected and interviews he conducted, Smith determined that an offense had occurred—failure to stop and render aid resulting in serious bodily injury to Fabian Ramirez.

Smith testified that Roy Bell identified himself to Smith at the scene, and Smith took Roy's statement. According to Smith, he heard a conversation between Jeff and Roy because Jeff had called Roy at about 9:23 p.m. while Roy was still at the scene, and Roy had the speaker of his phone on. Smith testified that he heard Jeff

9

ask if the victim was deceased, make comments about wanting to harm himself, and sounding anxious, excited, and "very slurry when he talked."

Smith testified that he was not able to locate Jeff Bell that night, but he later learned that Jeff Bell was in the Wharton County Jail. Smith got an offense report of Bell's arrest in Wharton County from DPS, and he also learned that Bell's vehicle had been towed. Smith identified photos he took of Bell's vehicle, which show the vehicle is missing the front bumper cover and the right front headlight was broken, and Smith testified that the damage to Bell's vehicle was consistent with what Smith found at the crash scene.

Smith testified that he met with Jeff Bell at the Wharton County Jail the day after the crash and a DVD copy of the video of his interview with Bell was admitted into evidence and played for the jury. Smith testified that the defendant told him that "after the crash" he got out and looked at the victim and saw that he had "pretty bad" injuries and got scared and left the scene and just started driving. Bell told Smith he had stopped at a store in the "Wharton area" and purchased one big beer. Smith testified he understood that Bell initially went to the Grangerland post office to get a haircut and was told that the hair salon was around the corner, however according to Smith, Bell did not remember being at the post office the day of the crash or why he was there, and Smith thought that was significant because "it's not like [] there had been such a time period that you wouldn't remember going to the post office[]"

10

and it could be a sign of intoxication. Bell told Smith that he was driving from the store onto FM 3083. Bell also told Smith that he drank the beer early in the day, but then he went to sleep. At one point in the interview, Bell told Smith that he was "buzzed" on the afternoon of the crash, he went to sleep, and he was dehydrated when he woke up. When asked whether he had concerns about the defendant saying he had slept the afternoon of the crash, Smith replied, "yes[,]. . . [b]ecause somebody that's been drinking to an extent that was described to me, becoming tired or sleepy or sleeping . . . at that time of day, the alcohol could be a factor in that." Smith agreed that he formed an opinion that Bell was intoxicated on the night of the crash based on the totality of the circumstances learned during his investigation.

According to Smith, Bell had the legal duty to stop at the scene, to provide his identification and insurance, to render aid to the victim by calling EMS for assistance or to provide aid himself to the best of his ability, but based on his investigation, Smith testified that Bell did not do this. Smith testified that it was "[a]bout 90 to 95 miles[]" from the crash scene to the location where the defendant was arrested in Wharton County at about 9:45 p.m. As a result of his investigation and interviews, Smith concluded that the defendant caused the crash

> . . . because the defendant failed to yield the right-of-way resulting in the motorcycle striking his vehicle; and the motorcycle occupants being ejected from the vehicle; and then the deceased victim further striking the trailer that was parked at the gas station.

11

Smith further testified that the defendant violated the traffic code by intentionally bypassing the traffic light at the intersection and cutting through a parking lot. Smith also testified that intoxication was a factor because it impairs judgment and slows reaction time.

Smith also testified that the traffic light by the intersection near where the crash happened was working on the day of the crash, that the skill level of the driver of the motorcycle could affect determination of the cause of the crash, and that the distance between the point of impact and where the female passenger lay did not necessarily mean the motorcycle was going at an extremely high speed. Smith testified that Neftali Ramirez—Fabian Ramirez's wife and a passenger on the motorcycle at the time of the crash—told him the traffic light was green when they drove through the intersection, but that Bell had a duty to yield right-of-way whether the light was red or green.

Testimony of Neftali Ramirez

Neftali Ramirez testified that Fabian Ramirez was her husband, that he bought a motorcycle on the day of the accident, but he had been riding motorcycles since he was fourteen years old. Neftali also testified that she and Fabian had motorcycle jackets and helmets because they had "driven bikes before." According to Neftali, Fabian drank a beer after work at about 3 p.m. on the day of the crash, but when they got on the motorcycle later to go to dinner, she did not believe Fabian was

12

intoxicated. Neftali recalled that Fabian was driving at a reasonable speed that night, the traffic light at the intersection was green, and Fabian moved the bike to the right because a vehicle on the left side of the road was coming toward them. According to Neftali, the car did not have the right-of-way, it was not supposed to be traveling in their lane, and they were not able to get the motorcycle out of the way. Neftali did not remember anything that happened right before or after the collision. Neftali testified there was nothing Fabian could have done to avoid the collision.

Testimony of Trooper Glen Taft

Glen Taft testified that he works for the highway patrol in Wharton County, and he encountered Jeff Bell at about 9:35 p.m. on June 2, 2020, on Highway 59 while on routine patrol. Taft noticed Bell's vehicle had a defective headlamp, and when he prompted Bell to pass him, it took a while for the car to stop. According to Taft, the vehicle pulled over to the left side of the road at the center median, and when Taft used his PA system to tell the driver to pull over on the right side of the road, the driver did not do so. Bell testified that he pulled his vehicle next to Bell's and he "noticed right away his [] expression on his face and his red glassy eyes[,]" and Taft thought "this person looks like they could be intoxicated." Taft recalled that when he approached Bell's vehicle, Bell's hands were outside the window, Bell's eyes were red and glassy, he looked disheveled, and some kind of liquid was on his shirt. According to Taft, as soon as Bell stepped outside his car, Bell's balance was

13

unsteady. Taft testified that Bell told him he was coming from Houston and that he was going to Surfside, which stood out to Taft because Bell was "substantially off course from going to Surfside." According to Taft, Bell told him he had drunk three beers. Taft recalled that when Bell flicked his cigarette into the grass, Taft noticed an open container of beer in the grass a few feet away and Bell told him it was his beer. Taft testified that when he picked up the can, he noticed it was still cold, and that meant "somebody had an open container in the vehicle with him while they were operating a motor vehicle." Taft testified that Bell admitted he had thrown out the beer, and Taft recalled that it looked like it was larger than a 12-ounce beer. Taft also testified that, while he was in his patrol car running Bell's information through dispatch, Bell "took off running on foot[,]" Taft then ran after him and took Bell into custody. When Taft did an inventory of Bell's vehicle, he noticed there was damage to the front and no front license plate.

Taft agreed he was qualified to conduct standardized field sobriety tests, which he conducted with Bell at the Wharton County jail. According to Taft, Bell displayed six of a possible six clues on the horizontal gaze nystagmus test, four out of a possible eight clues on the walk-and-turn test, and three out of a possible four clues on the one-leg stand test. Based on these test results and the way Bell looked and acted, Taft formed an opinion that Bell was intoxicated, and he placed Bell under arrest for driving while intoxicated. Taft also asked Bell to provide a breath

14

specimen, but Bell refused, so Taft filled out an affidavit for a blood warrant that was issued at 12:11 a.m. on June 3, 2020. According to Taft, he sealed the blood specimen in an evidence box and delivered it to the DPS crime lab in Houston on June 5, 2020.

According to Taft, Bell never mentioned to him the crash that occurred in Montgomery County. Taft identified State's Exhibit 78 as a recording of the DWI and evading arrest investigation he did on Jeff Bell on June 2, 2020, and the exhibit was admitted and played for the jury. In the recording, at one point Bell tells Taft that he has had three beers, and at another point, Bell tells Taft he had five beers.

Testimony of Jack McKelvy

Jack McKelvy testified that he works as a paramedic, and that in June 2020, he was working in Wharton. McKelvy agreed he performed a blood draw on Jeff Bell and created a report and that Bell was initially agitated and said they were not going to draw his blood, but that he later calmed down and allowed the blood draw. McKelvy recalled that he arrived at the Wharton County Jail at about 12:42 a.m. and left at 1 a.m.

Testimony of Cheryl Szkudlarek

Cheryl Szkudlarek testified that she is a forensic scientist with the DPS crime lab where she has worked for more than eight years analyzing controlled substances and blood or urine samples for alcohol concentration. She agreed she analyzed a

15

blood sample from Jeff Bell and that Glen Taft submitted the sample on June 5, 2020. According to Szkudlarek, if a blood sample sits in an officer's vehicle for two days before submitting it to the lab, it does not have an effect on her analysis and "[t]he most likely effect that you would see by it not being refrigerated is a decrease in the ethanol concentration[]" so that any change in the sample would only benefit the defendant.

Szkudlarek testified that she uses "headspace gas chromatography with flame ionization detection[]" in her analysis, and that this method has been around for many years and is widely accepted by the scientific community. Szkudlarek identified State's Exhibit 80 as her report on Bell's blood sample, and her analysis showed "0.238 grams of alcohol per 100 milliliters of blood." Szkudlarek also testified that the legal limit in Texas is 0.08 grams of alcohol per 100 milliliters of blood, and that "just under 12 standard drinks[]" would produce the blood alcohol content results observed in this case.

Testimony of Dr. Alex John

Dr. Alex John testified that he is a forensic pathologist and works for the Montgomery County Forensic Services Department, and he performed an external examination of Fabian Ramirez. Dr. John testified that the death certificate admitted

into evidence is for "Fabian Ramirez Sierra AKA Raymond Raul Sanchez Planas."[2] The doctor testified that Ramirez was a thirty-year-old Hispanic male who was taken to HCA Houston Healthcare Conroe after a motor vehicle-motorcycle collision where he was diagnosed with "multiple fractures, including rib fractures and other injuries, including lumbar fibular fractures and head trauma." According to the doctor, hospital personnel "worked on him for about two days" and Ramirez was pronounced dead on June 4, 2020. Dr. John determined that Ramirez's cause of death was multiple blunt-force trauma, consistent with being in a motor vehicle crash and the manner of death was accident.

On cross-examination, the defense sought to introduce evidence of Ramirez's blood alcohol content. The State objected that no proper foundation for the evidence had been established. After argument to the bench, the trial court denied admission of a toxicology report for Ramirez, and the defense withdrew Dr. John's report because it included a reference to "toxicology."

The jury found Bell guilty on both counts and, after a hearing on punishment, the jury assessed punishment at twenty years of confinement on each count. The trial court ordered the sentences to run concurrently. Bell timely filed his notice of appeal in both cases.

---

[2] Although the defense challenged the identity of the victim at trial, the victim's identity is not an issue on appeal.

## Admission of Evidence

In his first issue, Appellant argues that the trial court erred in excluding evidence of Ramirez's blood alcohol level at the time of the accident. According to Appellant, there was evidence that Ramirez was traveling faster than the speed limit and was found to have a blood alcohol level more than 0.08 when tested at the hospital. Appellant argues that Ramirez would have had an impaired response time due to his blood alcohol level that "could have made a difference between collision and no collision." For this reason, Appellant argues that Ramirez's blood alcohol content was "quite relevant[]" and the trial court erred by sustaining the State's motion in limine and excluding the evidence at trial.

We review a trial court's ruling on the admission of evidence under an abuse of discretion standard of review. *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 449-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law

applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

The erroneous admission or exclusion of evidence is generally reviewed under the standard for non-constitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *See Walters v. State*, 247 S.W.3d 204, 218-19 (Tex. Crim. App. 2007); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Under Rule 44.2(b), even if the trial court erred in admitting the evidence, we may not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). In our determination of whether error adversely affected the jury's decision, we consider everything in the record, including testimony, physical evidence, jury instructions, the State's theories, any defensive theories, closing arguments, and voir dire. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014).

Evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing Tex. R. Evid. 401). Relevant evidence is generally admissible. *See* Tex. R. Evid. 402; *Gonzalez*,

544 S.W.3d at 370. Even if the evidence is relevant, a trial court may determine that it is not admissible because the danger of unfair prejudice outweighs the evidence's probative value. *See* Tex. R. Evid. 403.

The Rules of Evidence require that evidence must be authenticated or identified, and "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). Authentication may be accomplished by testimony from a witness with knowledge that the item is what it is claimed to be. *See id.* 901(b)(1).

To establish the facts necessary to admit the results of a blood test, the proponent must show proof of a proper chain of custody of the blood sample that shows the beginning and end of a chain of custody, including proof that the sample came from the person the proponent alleged. *See Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989), *abrogated on other grounds by Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998) (Proof of the beginning and end of a chain of custody will support the admission of the evidence in the absence of any evidence of tampering or alteration.); *Brown v. State*, 240 S.W.2d 310, 311 (Tex. Crim. App. 1951) (blood test results were not admissible where there was no evidence that the specimen taken by a nurse at the hospital was the same specimen forwarded for analysis); *Dugar v. State*, 629 S.W.3d 494, 502 (Tex. App.—Beaumont 2021, pet. ref'd) (chain of custody was satisfied where there was "evidence showing where the

chain of custody began, with the nurse, and where it ended in the lab[]"); *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (stating that chain of custody is proved when the proponent has shown the beginning and the end of the chain of custody, particularly when the chain ends at a laboratory).

Business records may be admissible if there is some "indicia of reliability" and "fundamental trustworthiness[.]" *See Burleson v. State*, 585 S.W.2d 711, 713 (Tex. Crim. App. 1979). A business record may be authenticated when presented by an affidavit from the business's custodian of records that complies with Rules of Evidence 803(6) or (7) and 902(10). *See* Tex. R. Evid. 803(6), (7), 902(10). "Rule 803(6) allows an affidavit in lieu of calling a witness to authenticate the records, without which the documents become merely inadmissible hearsay." *Venable v. State*, 113 S.W.3d 797, 800 (Tex. App.—Beaumont 2003, pet. ref'd).

> A document prepared by a third party may be admissible under Rule 803(6) if: (1) it is incorporated and kept in the course of the testifying witnesses' business; (2) that business typically relies upon the accuracy of the contents of the document; and (3) the circumstances otherwise indicate the trustworthiness of the document.

*Bell v. State*, 176 S.W.3d 90, 92 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd).

Scientific evidence—such as results of blood testing at issue here—must be reliable to be admitted, and the reliability of scientific evidence requires that "(a) the underlying scientific theory must be valid (b) the technique applying the theory must be valid and (c) the technique must have been properly applied." *Bekendam v. State*,

21

441 S.W.3d 295, 303 (Tex. Crim. App. 2014) (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)); *see also Schard v. State*, No. 09-16-00291-CR, 2018 Tex. App. LEXIS 2390, at \*\*16-19 (Tex. App.—Beaumont Apr. 4, 2018, no pet.) (mem. op., not designated for publication) (applying the *Kelly* factors when considering the admissibility of blood test results).

In this case, the defendant sought to admit Ramirez's blood test results during cross-examination of Dr. John, the forensic pathologist who examined Ramirez's body after death. The doctor testified on voir dire that his report included a toxicology section that stated a sample of blood was received from the hospital. Dr. John did not know who drew the blood sample for Ramirez. Outside the presence of the jury, the defense questioned Dr. John about the toxicology report which showed that Ramirez had a blood alcohol concentration of 0.081.

The defense also sought to admit a Toxicology Report from NMS Labs in Horsham, Pennsylvania, that reflected blood test results for Raymond Sanchez, showing a blood alcohol concentration of 0.081. Dr. John testified that he asked for a toxicology report on the blood, and the report from NMS Labs was a copy of the report he requested. No business records affidavit from NMS Labs accompanied the Toxicology Report. The NMS Labs report states the source of the blood specimen was "001 - Hospital Blood" and the analysis was "Headspace GC[.]"

Dr. John testified that he regarded the NMS Labs report as trustworthy. When asked if he knew who drew the hospital blood that was sent to NMS Labs, Dr. John replied, "No." He also testified that he did not draw the blood personally. Dr. John testified he did not have to rely on the NMS Labs report for his findings. No witness from NMS Labs testified about the origin of the sample or the methodology or procedures used in the toxicology analysis.

The State objected to the toxicology report and the reference to toxicology in the doctor's report because there was no proper foundation. The State argued that Dr. John, the witness through whom the evidence was offered, did not draw the blood, and the defense did not have a witness to testify about who performed the blood draw. The State also argued that there was no business records affidavit for the lab report and that the defense could not say who drew the blood that was tested.

In denying admission of the NMS Labs report, the court stated that there was no indication who drew the blood, that no witness was available to testify that the blood samples were properly drawn, labeled, and tested, and that the lab report did not have the required indicia of trustworthiness.[3] After the trial court did not allow

---

[3] The trial court also questioned whether the probative value of the toxicology results would be substantially outweighed by the danger of unfair prejudice, however we do not read the record to say that the trial court denied admission expressly on this basis.

23

the NMS Labs report to be admitted, the defense withdrew its Exhibit 8, Dr. John's report, that included a reference to "Toxicology[.]"[4]

The trial court's ruling excluding the report is within the zone of reasonable disagreement. We cannot say the trial court abused its discretion in excluding the blood test results of the NMS Labs report. *See Gonzalez*, 616 S.W.3d at 594. No business records affidavit accompanied the report, as required by Rule of Evidence 803(6). *See* Tex. R. Evid. 803(6). There was no evidence of who drew the blood specimen and no testimony about the chain of custody. *See Dugar*, 629 S.W.3d at 502. No witness from NMS Labs testified about the method used to analyze the blood specimen and whether the method was performed accurately. *See Bekendam*, 441 S.W.3d at 303; *Kelly*, 824 S.W.2d at 573. Dr. John testified that he did not rely on the NMS blood test results to make his findings. The trial court could have reasonably determined that the defense did not lay the proper foundation and did not properly authenticate the NMS Labs report or its toxicology results. *See* Tex. R. Evid. 901. Therefore, the trial court did not err by excluding it. Because we conclude that the trial court did not abuse its discretion in excluding the blood alcohol report, we do not address whether the report was relevant or whether any relevance was

---

[4] The trial court stated that Dr. John's report could be admitted provided the reference to "toxicology" was redacted, but the defense objected to the redaction.

24

outweighed by the danger of unfair prejudice. *See* Tex. R. App. P. 47.1. We overrule Appellant's first issue.

Concurrent Causation Instruction

In his second issue, Appellant contends that the trial court erred by failing to include a jury charge instruction on concurrent causation under section 6.04(a) of the Texas Penal Code. According to Appellant, there was evidence that Ramirez's excessive speed may have contributed to his death, and Appellant also argues that evidence of Ramirez's intoxication was relevant to causation. Appellant argues that the failure to include a jury instruction on concurrent causation was harmful, constitutional error that resulted in an unfair trial.

Where an appellant raises jury charge error on appeal, the degree of harm necessary for reversal depends on whether the appellant preserved error by a timely objection at trial. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). When, as here, the defendant fails to object or states in the trial court that he has no objection to the charge, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *See State v. Ambrose*, 487 S.W.3d 587, 595 (Tex. Crim. App. 2016) ("[U]npreserved jury-charge error does not require a new trial, even when the error is complained of in a motion for new trial, unless the error causes 'egregious harm.'"); *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005). In reviewing claims of jury charge error, we use a two-step process.

25

First, we determine whether error exists in the charge. *Ngo*, 175 S.W.3d at 743. If error exists, we then determine whether it was "egregious harm" using the framework outlined in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g). *See Villarreal*, 453 S.W.3d at 433.

We review a trial court's refusal to include a defensive issue in the charge for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). An accused is entitled to an instruction on every defensive issue raised by the evidence. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987). This is true whether the evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). We must view the evidence in the light most favorable to the defendant's requested submission. *Bufkin v. State*, 207 S.W.3d 779, 782-83 (Tex. Crim. App. 2006).

Section 6.04(a) of the Penal Code states, "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor [was] clearly insufficient." See Tex. Penal Code Ann. § 6.04(a). To be entitled to such an instruction, the defendant must specifically show that (1) a force or agency in addition to the actor was a "but for" cause of the result charged, and (2) some evidence demonstrates the defendant's

26

conduct was clearly insufficient to cause the harm and the other, concurrent cause was clearly sufficient to cause the harm. *Cyr v. State*, 665 S.W.3d 551, 557-58 (Tex. Crim. App. 2022).

"The scope of causation under the Texas Penal Code is broad, allowing courts to find causation where 'the result would not have occurred but for [the] conduct, operating either alone or concurrently with another cause.'" *Id.* at 557 (quoting Tex. Penal Code § 6.04(a)). However, if a concurrent cause other than the defendant's conduct "was clearly sufficient to produce the result and the conduct of the actor clearly insufficient[,]" then causation is not established. Tex. Penal Code § 6.04(a); *see also Quintanilla v. State*, 292 S.W.3d 230, 234 (Tex. App.—Austin 2009, pet. ref'd).

Appellant argues that "[t]he trial court failed to include an application paragraph following the criminal responsibility paragraph, paragraph III, [] which should have explained the concept of concurrent causation." The record does not reflect that Appellant made such an objection at trial. In addition, the record does not include a proposed jury charge submitted by the defense nor a motion for new trial. Therefore, we first determine whether there was error in the jury charge, and if there was, whether the defendant suffered egregious harm. *See Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021); *Villarreal*, 453 S.W.3d at 433.

The trial court must charge the jury on the law applicable to the case. Tex. Code Crim. Proc. Ann. art. 36.14. Paragraph III of the jury charge actually submitted to the jury reads,

> III.
> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the Defendant clearly insufficient.
> IV.
> Now bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 2nd day of June, 2020, in Montgomery County, Texas, the Defendant, Jeff Taylor Bell, did then and there operate a motor vehicle in a public place while the Defendant was intoxicated, and by reason of that intoxication, cause the death of Fabian Ramirez Sierra, by accident or mistake, and you find from the evidence beyond a reasonable doubt that the death of Fabian Ramirez Sierra would not have occurred but for the Defendant's conduct, operating either alone or concurrently with another cause, and you find that the concurrent cause was not clearly sufficient to produce the result or that the conduct of the Defendant was not clearly insufficient to produce the result, then you will find the Defendant guilty of intoxication manslaughter as charged in Count II of the Indictment.

The jury instruction in paragraph III tracks the language of section 6.04(a) of the Penal Code. *See* Tex. Penal Code Ann. § 6.04(a). Paragraph IV applies the law stated in paragraph III to the facts in this case. Appellant has not identified how the jury charge actually given was inadequate. *See* Tex. R. App. P. 38.1(h), (i) (requiring an appellate brief to contain a "succinct, clear, and accurate statement of the arguments" and to provide appropriate citations to the record and to authorities).

Appellant cites to *Saenz v. State*, 474 S.W.3d 47, 53 (Tex. App.—Houston [14th Dist.] 2015, no pet.), wherein the Houston Fourteenth Court concluded that the trial court erred by not including an application paragraph on concurrent causation. In *Saenz*, the defendant was convicted of "intoxication manslaughter and accident involving injury or death." *Id.* at 49. The evidence suggested that the victim, Torres, was likely struck by the defendant's truck. *Id.* at 50. A toxicology report showed that Torres had a blood alcohol concentration of .172 when he died and that he had also used marijuana and cocaine at some point before he died. *Id.* The trial court excluded the toxicology report, which the defendant sought to admit as evidence that Torres's behavior was a concurrent cause sufficient to have caused his own death. *Id.* Other evidence showed that Torres was walking in the road and was "likely somewhere between the shoulder line and the middle of the lane when he was struck[.]" *Id.* at 52. The jury also heard evidence that Torres was dressed in dark clothes, that there was no evidence that the defendant's vehicle left the roadway, and that the highway shoulder was very narrow with little room to walk on the shoulder. *Id.* On appeal, the Fourteenth Court explained,

> there was at least some evidence before the jury that appellant's intoxication did not necessarily cause the collision and Torres's resulting death. Equally important, the jury heard some testimony that it was essentially Torres's actions that caused his death, and that it would have been difficult for any driver, sober or intoxicated, to avoid hitting Torres.

29

*Id.* The Houston Fourteenth Court of Appeals found the trial court erred in failing to include a concurrent causation instruction, but the court did not explain or state what the application paragraph applying the law of concurrent causation to the facts of the case should state.

We find *Saenz* factually distinguishable from this case. In *Saenz*, there was testimony that many drivers would have had a hard time seeing Torres in time to avoid hitting him and there was evidence before the jury that appellant's intoxication did not necessarily cause the collision. Here, there is no testimony or evidence in our case that drivers would have had a hard time seeing Ramirez. Although there was some testimony that Ramirez was traveling faster than the speed limit, Appellant points to no testimony that Ramirez's speed alone was sufficient to have caused the accident. The jury heard Neftali testify that Ramirez had a beer after work, and although the trial court excluded the toxicology results, and there was no testimony that Ramirez's drinking or blood alcohol concentration was sufficient on its own to have caused the accident. Unlike in *Saenz*, Appellant also fails to identify any "evidence before the jury that appellant's intoxication did not necessarily cause the collision and [the victim's] resulting death." *See id.* He only argues that evidence of Ramirez's excessive speed and of intoxication "should have been considered within a construct of concurrent causation" and that "harmful, constitutional error" resulted. Appellant identifies no evidence showing that Ramirez's conduct was "clearly

sufficient" to cause the accident and his death *and* no evidence that Bell's conduct was insufficient. *See* Tex. Penal Code Ann. § 6.04(a). Without such evidence, the trial court had no obligation to include an application paragraph on concurrent causation in the jury charge. *See id.* at 52-53; *see also Cyr*, 665 S.W.3d at 557-58 (requiring a defendant to produce evidence to support an instruction on concurrent causation). Also, even if the trial court was required to include an instruction on concurrent causation, Appellant does not identify how the instruction actually given was inadequate or deficient. *See* Tex. R. App. P. 38.1(h), (i). Because we find the jury charge given in this case was not in error, we need not determine whether harm resulted. *See Ngo*, 175 S.W.3d at 743. We overrule Appellant's second issue.

Even though we have overruled both of Appellant's issues, we note that the section of the judgment on Count I entitled "Statute for Offense[]" recites "550.021(a) Penal Code[.]" However, the indictment for the underlying offense lists the offense as "Accident Involving Personal Injury or Death" and tracks the language of section 550.21 of the Texas Transportation Code. This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993). We therefore reform the judgment on Count I to reflect that the "Statute for Offense" for Count I is "550.021(a) Transportation Code[.]"

31

Having overruled both of Appellant's issues, we affirm the trial court's judgment on Count I as modified, and we affirm the trial court's judgment on Count II.

AFFIRMED AS MODIFIED; AFFIRMED.


LEANNE JOHNSON
Justice

Submitted on May 22, 2023
Opinion Delivered September 13, 2023
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.